IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

———————————————————— )
)
FEDERAL TRADE COMMISSION and )
STATE OF MAINE, )
) Case No.
Plaintiffs, )
)
v. ) **COMPLAINT FOR PERMANENT**
) **INJUNCTION AND OTHER**
MARKETING ARCHITECTS, INC., ) **EQUITABLE RELIEF**
)
Defendant. )
———————————————————— )

Plaintiffs, the Federal Trade Commission ("FTC") and the State of Maine, for their

Complaint allege:

1.     The FTC brings this action under Section 13(b) of the Federal Trade Commission

Act ("FTC Act"), 15 U.S.C. § 53(b), to obtain permanent injunctive relief, rescission or

reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten

monies, and other equitable relief for Defendant's acts or practices in violation of Sections 5(a)

and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, in connection with the advertising, marketing,

distribution, and sale of purported weight-loss products.

2.     The State of Maine brings this action under the Maine Unfair Trade Practices Act,

5 M.R.S.A. §§ 205-A through 214  ("Maine UTPA"), to permanently enjoin and restrain

Defendant from engaging in certain unlawful unfair and deceptive acts or practices in the

conduct of trade or commerce, and to obtain relief for Defendant's acts or practices in violation

of the Maine UTPA in connection with the advertising, marketing, distribution, and sale of

purported weight-loss products, such relief to include rescission or reformation of contracts, the refund of monies paid, disgorgement, restitution, civil penalties, other relief as provided in the Maine UTPA, and other equitable relief.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), and 53(b), and supplemental jurisdiction over the claims of the State of Maine pursuant to 28 U.S.C. § 1367.

4.     Venue is proper in this district under 28 U.S.C. § 1391(b), (c), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFFS

5.     The FTC is an independent agency of the United States Government created by statute.  15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces Section 12 of the FTC Act, 15 U.S.C. § 52, which prohibits false advertisements for food, drugs, devices, services, or cosmetics in or affecting commerce.

6.     The FTC is authorized to initiate federal district court proceedings by its own attorneys to enjoin violations of the FTC Act, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b) and 56(a)(2)(A).

7.     Plaintiff State of Maine is one of fifty sovereign states of the United States.  Janet T. Mills is the duly elected and qualified Attorney General acting for Plaintiff State of Maine and is authorized to enforce the Maine UTPA pursuant to 5 M.R.S.A. §§ 191 and 209 and the powers vested in her by common law.

8.     This Court has supplemental jurisdiction over Plaintiff State of Maine's claims under 28 U.S.C. § 1367.

## DEFENDANT

9.     Defendant Marketing Architects, Inc. ("Defendant" or "MAI") is a Minnesota corporation with its principal place of business at 110 Cheshire Lane, Suite 200, Minneapolis, Minnesota 55305.  Defendant transacts or has transacted business in this district.  At times material to this Complaint, acting in concert with others, Defendant has advertised, marketed, distributed, or sold various weight-loss products to consumers in this district and throughout the United States and Canada.

## COMMERCE

10.     At all times material to this Complaint, Defendant has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44 and as "trade and commerce" are defined in Section 206(3) of the Maine UTPA, 5 M.R.S.A. § 206(3).

## DEFENDANT'S BUSINESS ACTIVITIES

11.     In January 2016, Plaintiffs filed a complaint in the United States District Court for the District of Maine against Direct Alternatives ("DA"), Anthony Dill, and Staci Dill.  *FTC v. Dill*, No. 2:16-cv-00023-GZS (D. Me. filed Jan. 19, 2016) (the "*DA* case").  MAI was not a defendant in the *DA* case.  The *DA* case concerned the advertising, marketing, distribution, and sale of purported weight-loss products, AF Plus and Final Trim.  Some of the allegations in this Complaint are similar to allegations in the *DA* case complaint. The *DA* case was resolved with respect to all parties thereto through a stipulated final order entered by Judge Singal on February 5, 2016.  The *DA* case stipulated final order contained a final judgment in the amount of

$16,419,989.00, as equitable monetary relief.  That sum represented the total sales of AF Plus and Final Trim to consumers, minus refunds and chargebacks, for the period January 1, 2012 to March 1, 2015.  Most of that judgment amount was suspended upon a showing that the *DA* case defendants turned over certain specified assets to a liquidation receiver and lacked the ability to pay the remainder of the judgment.  The liquidation receiver continues to sell assets and file periodic reports with the Court.

12.     Defendant is an advertising agency specializing in direct response radio and television ads.  Among other things, Defendant creates and disseminates radio ads for its clients containing toll-free telephone numbers inviting consumers to call to purchase products.  Defendant also creates and implements scripts for its Interactive Voice Response ("IVR") system, and provides analysis to its clients of the performance of these scripts.  Defendant's IVR system is an automated computerized system controlled by Defendant that permits Defendant to capture its clients' orders whenever they choose to use the system, which is available 24 hours a day, 7 days a week.  Consumers interact with the IVR system to provide their names, addresses, and credit or debit card information; listen to the details of the offers, including offers to purchase products on a continuity program; listen to details of offers to purchase additional upsold and cross-sold products, such as buying clubs, additional dietary supplements, and expedited shipping; and accept or decline the offers.  Defendant provides testing, analysis, and strategic advice to its clients about the performance of iterations of its radio ads and IVR scripts.

13.     In or about January 2006, DA entered into a contract with Defendant whereby DA agreed to pay Defendant to create and disseminate radio advertisements and to provide supporting IVR telemarketing services in connection with the sale of DA's dietary supplements.  Among the DA products for which Defendant created and disseminated radio advertisements and

4

provided supporting IVR telemarketing services were dietary supplements purported to cause weight loss, including Puranol, Pur-Hoodia Plus, PH Plus, Acai Fresh, AF Plus, and Final Trim (collectively "DA's Weight-Loss Products").  Radio ads for DA's Weight-Loss Products were disseminated at different times from approximately January 2006 to approximately February 2015.

14.     Beginning in or about January 2006 and continuing to early 2015, Defendant and its client, DA, employed unfair or deceptive marketing tactics in the advertising, marketing, and sale of the dietary supplements described above.  Defendant and DA offered these products directly to consumers, through radio advertising nationwide and in Canada, generating more than $16 million in gross sales for DA minus refunds and chargebacks attributable to AF Plus and Final Trim alone during the period of January 1, 2012 through early 2015.

15.     Defendant also created and disseminated weight-loss advertising for other clients. Beginning in or about March 2009 and continuing until about May 2011, Defendant created and disseminated radio ads for Sensa, a weight-loss product sold by Sensa Products, LLC. Beginning in or about July 2014 and continuing until at least April 2015, Defendant created and disseminated radio ads and IVR scripts for Neu Garcinia Cambogia, a weight-loss product sold by MI6 Holding, LLC ("MI6").

**MAI'S ADVERTISING FOR AF PLUS**

16.     One bottle of AF Plus sold for approximately $39.95 and contained 30 capsules. It was usually sold as part of a minimum order of two bottles for $79.90, plus shipping and processing.  The recommended serving size was one capsule per day.  AF Plus contained a proprietary blend that included 750 mg of:

- Acai fruit extract (*Euterpe oleracea*)

- Green tea leaf extract (98% polyphenols, 75% catechins, 45% EGCG, 150mg caffeine)
- *Panax ginseng* root extract (4% ginsenosides)
- Pomegranate fruit extract (20% ellagic acid)
- Amla fruit extract

The formulation of AF Plus was identical to that of Acai Fresh, another weight-loss product that was marketed and sold by DA, and about which Defendant created and disseminated radio advertisements and IVR scripts.

17.     Defendant created and disseminated or used numerous radio advertisements and IVR scripts for AF Plus containing false or deceptive weight-loss claims.  Examples of these claims are contained in Paragraphs 18-23 below.

18.     One of the Defendant-created and -disseminated radio advertisements for AF Plus began with a voiceover asking, "Do you want to lose 10 pounds?  How about thirty, or even fifty pounds?"  A purported company spokesperson then claimed that "[w]hen we created this once daily weight loss capsule, we had no idea it would work THIS well," and described AF Plus as a "proven breakthrough in weight loss!"  Exhibit 1, p. 1.

19.     In another Defendant-created and -disseminated radio advertisement, the purported company spokesperson stated, "Hi, I'm Stacey Howard with AF Plus.  I've lost a ton of weight with AF Plus, and now you can too."  Exhibit 1, p. 2.  This character was invented by Defendant and was fictitious, as were her reported experiences.

20.     Defendant-created and -disseminated radio advertisements for AF Plus claimed, "AF Plus is an amazing PROVEN breakthrough in weight loss," Exhibit 1, pp. 2-3, and "this product is proven and can cause dramatic weight loss."  Exhibit 1, p. 4; *see also* Exhibit 1, p. 6. MAI had no studies of AF Plus and had no knowledge of any studies of AF Plus or any product containing the same formulation.

6

21.     Many Defendant-created and -disseminated radio advertisements scripts for AF Plus claimed that users lose pounds in days and 30 pounds or more.  Exhibit 1, pp. 1-4.

22.     An IVR script that Defendant created and used to take customer orders claimed:

a.      "[AF Plus is] so powerful, it even works while you sleep!"

b.      "With the metabolism-boosting benefits of AF Plus, you can keep eating your favorite foods and STILL lose pounds and inches – in fact, we guarantee it!"

c.      "Try [AF Plus] just once a day for thirty days and if you're not on your way to being thirty pounds thinner, just send it back and risk nothing." Exhibit 2.

23.     Another of the Defendant-created and -disseminated radio advertisements for AF Plus claimed, "Mayo Clinic research proves that carrying fat in your midsection raises your risk of heart disease, stroke, high blood pressure, even cancer.  If you need to lose weight, you absolutely must call now."  Exhibit 1, p. 4.  When consumers called to order they were then told: "Best of all, one capsule lasts an entire day.  That's 24 hours of fat burning power."  That IVR recording also claimed that users lose "pounds and inches."  Exhibit 2.

## MAI'S ADVERTISING FOR FINAL TRIM

24.     One bottle of Final Trim sold for approximately $39.95 and contained 30 capsules.  It was usually sold as part of a minimum order of two bottles for $79.90, plus shipping and processing.  The recommended serving size was two capsules per day.  Final Trim contained the following ingredients:

- Thiamin (as thiamin mononitrate), 1mg
- Riboflavin, 1.13mg
- Konjac root (glucomannan), 1,000mg
- HyperLoss blend 380mg*

>*Rhodiola rosea* root extract (1% rosavins), Ashwagandha root (from 5:1 concentrate), Bee pollen, Green Tea Extract, Licorice root (from 4:1 concentrate), Schizandra berry (from 10:1 extract), Acai fruit (*Euterpe oleracea*) (from 5:1 extract), Adrenal (bovine), Wild jujube seed extract, Passion flower extract (plant), *Panax ginseng* root, 5-HTP (from *Griffonia simplicifolia* seed extract), Zinc ascorbate, Biotin

25.     Defendant created and disseminated or used numerous radio advertisements and IVR scripts for Final Trim containing false or deceptive weight-loss claims.  Examples of these claims are contained in Paragraphs 26-29 below.

26.     One Defendant-created and -disseminated radio advertisement for Final Trim featured the female and male voices of purported product endorsers who claimed to have lost 50 pounds, 30 pounds, and 45 pounds, respectively.  Exhibit 3, p.9.  Another Defendant-created and -disseminated radio advertisement for Final Trim featured a purported company spokesperson, Jill Moore, who stated, "I got tired of being fat.  Being overweight really limited my life because I didn't have any self confidence.  I've since lost [all of] the extra pounds and inches with Final Trim.  Hi, I'm Jill Moore with Final Trim.  If you need to lose 30 pounds or more, I'm inviting you to participate in our nationwide risk-free trial."  Exhibit 3, p. 10.  These characters were invented by Defendant and were fictitious, as were their reported experiences.

27.     Defendant-created and -disseminated radio advertisements for Final Trim claimed, "Final Trim is an amazing PROVEN breakthrough in weight loss:  a ONCE-daily capsule that can help you lose weight in days," Exhibit 3, p. 11; *see also* Exhibit 3, p. 16, and "Final Trim is proven and can cause dramatic weight loss without killing your muscle. . . . [E]xperience maximum weight loss – pounds in days."  Exhibit 3, p. 12; *see also* Exhibit 3, p. 14.  MAI had no studies of Final Trim and had no knowledge of any studies of Final Trim or any product containing the same formulation.

28.     Many of the Defendant-created and -disseminated radio advertisements scripts for Final Trim similarly claimed that users lose pounds in days and 30 pounds or more.  Exhibit 3.

29.     An IVR script that Defendant created and used for Final Trim claimed:

      a.     "[Final Trim is] so powerful, it even works while you sleep!"

      b.     "Because Final Trim helps you shed body fat more quickly, [y]ou can keep eating your favorite foods and STILL lose pounds and inches – in fact, we guarantee it!"

      c.     "Try it just once a day for thirty days and if you're not on your way to being thirty pounds thinner, just send it back and risk nothing."  Exhibit 4.

## MAI'S COMMON THEMES AND CLAIMS IN RADIO ADVERTISING
## FOR OTHER WEIGHT-LOSS PRODUCTS

30.      Defendant created and disseminated radio ads for other DA Weight-Loss Products, for Sensa, and for Neu Garcinia Cambogia that employed themes and claims similar to those Defendant created and disseminated for AF Plus and Final Trim.  These ads reflect Defendant's pattern or practice of creating and disseminating clearly deceptive weight-loss and marketing claims proven to generate high consumer response for AF Plus and Final Trim.  Higher consumer responses resulted in greater revenues for Defendant's clients and, through the purchase of additional advertising by its clients, for Defendant.

### Sensa

31.     In January 2014, the FTC filed a complaint in the United States District Court for the Northern District of Illinois against Sensa Products, LLC and others.  *FTC v. Sensa Prods., LLC*, No. 1:14-cv-00072 (N.D. Ill. filed Jan. 7, 2014) (the "*Sensa* case").  The *Sensa* case concerned the advertising, marketing, distribution, and sale of a powdered substance sprinkled

on food that purportedly caused substantial weight loss.  The *Sensa* case was resolved with respect to all parties thereto through a stipulated final order entered on January 8, 2014 and required, among other things, that the corporate defendants pay $26,500,000 in consumer redress.

32.     Defendant created radio ads for Sensa that contained claims similar to those made for AF Plus and Final Trim and were disseminated by Defendant from approximately March 2009 to approximately May 2011.  Some of those ads contained the following claims, which were similar to those Defendant created for AF Plus and Final Trim:

a.      "[S]hed thirty pounds or more" without "any dieting, pills or change in lifestyle";

b.      "[Y]ou can lose thirty pounds, fifty pounds – or more in a matter of months";

c.      "I lost 50 pounds and went from a size 19 to a 9-10";

d.      "I lost seventy-two pounds – AFTER I stopped dieting!";

e.      "To experience the most dramatic weight loss results, you must be over the age of 25 and want to lose over 30 pounds";

f.      "It's a clinically proven way to lose thirty pounds or more"; and

g.      "[A] clinically proven weight loss breakthrough that can help you lose up to thirty pounds or more!"

33.     Section I of the *Sensa* order prohibited the *Sensa* defendants and their agents from representing that any product (a) causes or helps cause weight loss or any specific amount of weight loss; (b) causes or helps cause rapid weight loss; or (c) causes or helps cause substantial weight loss; unless defendants and their agents have competent and reliable scientific evidence

that substantiates that the representation is true.  For purposes of Section I of the *Sensa* order,

competent and reliable scientific evidence was specified to consist of at least two adequate and

well-controlled human clinical studies of the Covered Product or of an Essentially Equivalent

Product, or of the Covered Weight-Loss Program or of an Essentially Equivalent Weight-Loss

Program, conducted by different researchers, independently of each other, that conform to

acceptable designs and protocols and whose results, when considered in light of the entire body

of relevant and reliable scientific evidence, are sufficient to substantiate that the representation is

true.

34.     Section X of the *Sensa* order required the *Sensa* defendants to send copies of the

order to all agents who participated in conduct related to the subject matter of the order and to

obtain from those agents a signed and dated acknowledgement of receipt of the order.

35.     On or about January 27, 2014, Defendant MAI's Chief Financial Officer signed

an acknowledgement of receipt of the *Sensa* order, thus making Defendant aware of FTC

scrutiny of weight-loss claims and the need for marketers to have substantiation for those claims.

## MAI'S KNOWLEDGE OF THE SUBSTANTIATION REQUIREMENT FOR
## ADVERTISING CLAIMS REGARDING WEIGHT LOSS

36.     In addition to receipt of the *Sensa* order in January 2014, Defendant had

previously been made aware of advertisers' obligations to have competent and reliable scientific

evidence substantiating weight-loss claims disseminated in advertising.  In January 2006, DA

forwarded to Defendant's account manager advice DA received from DA's attorney regarding

advertising claims that Defendant created for DA.  DA's attorney wrote that "there are still

serious questions regarding your [DA's] ability to substantiate certain claims, such as:  'the

average American has up to 10 pounds of compacted waste and toxic poisons built up inside

11

them' and 'with Puranol, you can [get] rid of all that gunk, so you can feel healthier and lose weight'."   The attorney advised DA to "[c]ontinue to bear in mind that, as I've noted several times in the past, if you use this advertising, regulators will expect that you have competent and reliable scientific evidence to substantiate the claims."

37.     In December 2008, DA forwarded to Defendant's account manager advice that DA had received from DA's attorney regarding advertising claims Defendant created for DA. One advertising claim DA's attorneys evaluated was "[t]rying to lose at least 10 pounds."  DA's attorneys stated that this claim was "risky" because the "FTC will require evidence that the product helps the typical user lose at least 10 pounds.  Unless you have evidence that the typical user loses at least 10 pounds, we recommend deleting the claim."  DA's attorneys also advised that weight loss claims "such as 'burn fat' and 'lose inches' are particularly risky. . . .  We highly recommend deleting the 'burn fat' and 'lose inches' claims."  DA's attorneys also asked about the basis for an ad claim that Acai Fresh is effective in causing weight loss in people between ages 25 and 54.

38.     In or about April 2011, a radio station notified Defendant that the station would not run ads for Acai Fresh "until we [MAI] provide substantiation."  Defendant's account manager noted in the company's internal database that Defendant's advertising team did not currently have substantiation.

**FALSE TESTIMONIALS FOR OTHER DA WEIGHT-LOSS PRODUCTS**

39.     In a Defendant-created and -disseminated radio advertisement for Puranol, an unidentified woman stated, "In six months of taking Puranol, I've already lost 30 pounds." Exhibit 5, p. 21.  This character was invented by Defendant and was fictitious, as were her reported experiences.

40.     In a Defendant-created and -disseminated radio advertisement for Pur-Hoodia Plus, an unidentified woman stated, "I went from a 14 to a size 10 . . . without feeling hungry!" Exhibit 6, p. 23.  This character was invented by Defendant and was fictitious, as were her reported experiences.

41.     In a Defendant-created and -disseminated radio advertisement for PH Plus, a woman identified as "Paula" claimed "I couldn't believe how fast I lost ten pounds!"  In that same ad, a woman identified as "Vickie" claimed, "My first bottle I lost ten pounds."  Also in that same ad, a woman identified as "Darlene" claimed, "I have been taking PH Plus and I have already lost ten pounds!"  Finally, in that same ad, a woman identified as "Maggie" claimed, "I dropped from a dress size 6 to a size 4."  Exhibit 7, p. 24.  These four characters were invented by Defendant and were fictitious, as were their reported experiences.

42.     In a Defendant-created and -disseminated radio advertisement for Acai Fresh directed at consumers "trying to lose thirty pounds or more," an unidentified woman claimed "One capsule a day helped me lose the weight."  In that same ad, another unidentified woman claimed, "One capsule a day, and I'm back into my skinny jeans."   Also in that same ad, an unidentified man claimed, "One capsule a day, and I'm burning fat . . . just like that."  Exhibit 8, p. 26.  These three characters were invented by Defendant and were fictitious, as were their reported experiences.

## FALSE FORMATS

43.     Defendant created and disseminated falsely-formatted radio advertising for various weight-loss products, including for clients other than DA.  For example:

a.   A radio spot for Puranol was formatted to appear as a "health news" report and asked listeners to "please stay tuned to this important announcement" [Exhibit 5, p. 22];

b.   A radio spot for PH Plus was formatted as an "invit[ation] to participate in a FREE study of an amazing all-natural breakthrough that helps you lose weight by actually suppressing your appetite!" [Exhibit 7, p. 25];

c.   A radio spot was formatted to appear as a public service announcement to fight the obesity epidemic with AF Plus [Exhibit 1, p. 5];

d.   A radio spot was formatted to appear as an interruption of the regularly-scheduled broadcast to promote risk-free trials of Final Trim to address the obesity crisis [Exhibit 3, p. 15];

e.   A radio spot for Final Trim claimed, "The following message is not a radio commercial. It's a gift to anyone listening today who needs to lose weight" [Exhibit 3, p. 16]; and

f.   A radio spot for Sensa contained a "[w]arning" attributed to the Surgeon General about obesity as the fastest-growing cause of death in America and touted an "official program" for people having "more than 15 pounds to lose" to "[p]articipate in the official free trial." [Exhibit 9, p. 27.]

Each of the above-described radio spots was, in fact, only a paid advertisement for the identified weight-loss product.

**MAI'S INADEQUATE DISCLOSURE OF "RISK-FREE" AND "FREE" TRIALS**

44.   Near the beginning of the in-bound calls, Defendant captured consumers' billing information and credit card numbers. This is followed by what is labeled in the IVR scripts as

14

"Offer Details."  The AF Plus IVR scripts created by Defendant failed to adequately disclose in those Offer Details that consumers ordering an "absolutely risk-free" trial were actually signing up for a continuity program.  The following excerpt is typical of the IVR scripts written by Defendant for AF Plus:

> OFFER DETAILS
> Here's how your risk-free trial works. Today we're sending you 2 bottles of AF Plus to try risk-free for 30 days. Try it just once a day for thirty days and if you're not on your way to being thirty pounds thinner, just send it back and risk nothing. If you like it and decide you want to continue losing weight, you don't have to do anything else. After 30 days, we'll simply bill you $39.95 per bottle for your initial supply. And we'll continue to ship a fresh 2-month supply every 2 months for the low rate of just $39.95 per month plus shipping and processing for as long as you want to lose the weight. And you'll always have the option to cancel, skip, or delay any future shipments by calling the customer service number in your package. That number is 1-800-605-1231.
>
> PROMPT
> So, do you agree to start your risk-free trial?  [Exhibit 2.]

45.    The Final Trim IVR scripts created by Defendant failed to adequately disclose that consumers ordering an "absolutely risk-free" trial were actually signing up for a continuity program.  The following excerpt is typical of the IVR scripts written by Defendant for Final Trim:

> OFFER DETAILS
> Here's how your risk-free trial works. Today we're sending you 2 bottles of FinalTrim [*sic*] to try risk-free for 30 days. Try it just once a day for thirty days and if you're not on your way to being thirty pounds thinner, just send it back and risk nothing. If you like it and decide you want to continue losing weight, you don't have to do anything else. After 30 days, we'll simply bill you $39.95 per bottle for your initial supply. And we'll continue to ship you a fresh 2-month supply every 2 months for the low rate of just $39.95 per month plus shipping and processing for as long as you want to lose weight. And you'll always have the option to cancel, skip, or delay any future shipments by calling the customer service number in your package. That number is 1-800-605-1231.
>
> PROMPT
> So, do you agree to start your risk-free trial?  [Exhibit 4.]

46.     The Neu Garcinia Cambogia IVR scripts created by Defendant failed to adequately disclose that consumers ordering the product "absolutely free" were actually signing up for a continuity program.  The following excerpt is typical of the IVR scripts written by Defendant for Neu Garcinia Cambogia:

> OFFER DETAILS
> Here's how your free trial works. Today we're sending you a full size bottle of Neu Garcinia Cambogia to try free for 2 weeks. Try it just twice a day for 2 weeks and if you're not on your way to being 30 pounds thinner, just send it back and risk nothing. If you like it and decide you want to continue losing weight, you don't have to do anything else. After 14 days, we'll simply bill you the discounted rate of just $69.95 for your initial supply. And we'll continue to ship you a fresh supply every month for the same discounted rate plus shipping and handling for as long as you want to lose the weight. And you'll always have the option to cancel, skip, or delay any future shipments by calling the customer service number in your package. That number is 1-888-501-6381.
>
> PROMPT
> So, do you agree to start your free trial?  [Exhibit 10.]

47.     An automated voice, rather than a live person, read the offer details section of Defendant's IVR scripts for AF Plus, Final Trim, and Neu Garcinia Cambogia. Consumers were not permitted to slow down, pause, or rewind the recording.  The only way consumers could have the offer details repeated to them was to end the call; call again; and listen again to the automated voice from the beginning of the script. Defendant provided consumers with no option to speak with a live person who could answer any questions.

48.     Defendant's IVR scripts failed to disclose or disclose adequately that consumers were required to take some affirmative action to avoid further charges and did not specify what that action was.  The IVR scripts also did not specify when the trial periods ended.

49.     The prompted question at the conclusion of the offer details section of the IVR scripts did not seek authorization from the consumer either to spend a specified amount or to enter into a continuity program.  Rather, the question posed was whether the consumer agreed to start his or her "risk-free" or "free" trial.  Nor did the offer details section of the scripts for AF Plus and Final Trim provide consumers with the total cost of the two-month supply that would be shipped via the continuity program.  Further, Defendant's scripts for AF Plus, Final Trim, and Neu Garcinia Cambogia provided the cost of shipping and processing or handling in a different part of the scripts, omitting that information from the subsequent summary of the offer details set forth in Paragraphs 45-47 above.  Consequently, consumers did not receive the total cost of their "risk-free" or "free" trials before agreeing to participate in the trials.

50.     Defendant designed the confusing and ambiguous offer language for AF Plus, Final Trim, and Neu Garcinia Cambogia to maximize the rate by which consumers would say "yes" to risk-free or free trials and thereby be enrolled in continuity programs. This proven marketing strategy was designed by Defendant to generate high consumer response and increase Defendant's revenues through ad purchases.

51.     Defendant captured consumers' credit card information and supplied this information to DA and MI6, which in turn submitted charges to merchant credit and debit card processors for payment.

**VIOLATIONS OF THE FTC ACT**

52.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

17

53.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

54.     Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers themselves cannot reasonably avoid and that is not outweighed by countervailing benefits to consumers or competition.  15 U.S.C. § 45(n).

55.     For purposes of Section 5(a) of the FTC Act, the term "unfair or deceptive acts or practices" includes acts or practices involving foreign commerce that involve material conduct occurring within the United States.  All remedies available to the Commission with respect to unfair and deceptive acts or practices shall be available, including restitution to domestic or foreign victims.  15 U.S.C. § 45(a)(4).

56.     Section 12 of the FTC Act, 15 U.S.C. § 52, prohibits the dissemination of any false advertisement in or affecting commerce for the purpose of inducing, or which is likely to induce, the purchase of food, drugs, devices, services, or cosmetics.  For the purposes of Section 12 of the FTC Act, 15 U.S.C. § 52, Puranol, Pur-Hoodia Plus, PH Plus, Acai Fresh, AF Plus, Final Trim, and Sensa are "drugs," as defined in Section 15(c) of the FTC Act, 15 U.S.C. § 55(c).  The term "false advertisement" means an advertisement, other than labeling, which is misleading in a material respect.  15 U.S.C. § 55(a)(1).

## COUNT I

### FALSE OR UNSUBSTANTIATED CLAIMS FOR AF PLUS AND FINAL TRIM

57.     Through the means described in Paragraphs 17-23 and Paragraphs 25-29, including, but not limited to the statements and representations contained in advertising and IVR

scripts attached as Exhibits 1 through 4, Defendant has represented, directly or indirectly, expressly or by implication, that:

    a.    AF Plus will cause users to lose weight, including 30 pounds or more;

    b.    AF Plus will cause users to lose pounds in days;

    c.    AF Plus burns fat;

    d.    AF Plus boosts users' metabolism, thereby allowing users to keep eating their favorite foods and still lose pounds and inches;

    e.    Final Trim will cause users to lose weight, including 30 pounds or more;

    f.    Final Trim will cause users to lose pounds in days; and

    g.    Final Trim will cause users to shed body fat, thereby allowing users to keep eating their favorite foods and still lose pounds and inches.

58. The representations set forth in Paragraph 57 are false or misleading, or were not substantiated at the time the representations were made. Therefore, the making of the representations set forth in Paragraph 57 constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

## COUNT II

## FALSE CLAIMS THAT AF PLUS AND FINAL TRIM ARE PROVEN TO CAUSE USERS TO LOSE SUBSTANTIAL WEIGHT

59. Through the means described in Paragraph 20, including, but not limited to, the statements and depictions contained in the advertisement attached as Exhibit 1, pp. 2-4 and 6, Defendant has represented, directly or indirectly, expressly or by implication, that AF Plus is proven to cause users to lose substantial weight, including 30 pounds or more.

60.     Through the means described in Paragraph 27, including, but not limited to, the statements and depictions contained in the advertisement attached as Exhibit 3, pp. 11, 14, and 16, Defendant has represented, directly or indirectly, expressly or by implication, that Final Trim is proven to cause users to lose substantial weight, including 30 pounds or more.

61.     The representations set forth in Paragraphs 59 and 60 are false or misleading. Therefore, the making of the representations set forth in Paragraphs 59 and 60 of this Complaint constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

## COUNT III

## FALSE ADVERTISING CLAIMS THROUGH CONSUMER TESTIMONIALS

62.     Through the means described in Paragraphs 19, 26, and 39-42, Defendant has represented, directly or indirectly, expressly or by implication, that the testimonialists appearing in Defendant's advertising for Puranol, Pur-Hoodia Plus, PH Plus, Acai Fresh, AF Plus, and Final Trim were actual persons who had successfully used those products to lose substantial weight.

63.     The representations set forth in Paragraph 62 are false or misleading because the testimonialists appearing in Defendant's advertising were fictitious, and their reported experiences did not occur.  Therefore, the making of the representations set forth in Paragraph 62 constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

## COUNT IV

## DECEPTIVE FORMAT OF RADIO ADVERTISING

64.     Through the means described in Paragraph 43, Defendant has represented, directly or indirectly, expressly or by implication, that radio advertisements for Puranol, PH Plus, AF Plus, Final Trim, and Sensa were objective news reports or public service announcements.

65.     In truth and in fact, these radio advertisements were not objective news reports or public service announcements.

66.     Therefore, the making of the representations as set forth in Paragraph 64 constitutes a deceptive act or practice and the making of false advertisements, in or affecting commerce, in violation of Sections 5(a) and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52.

## COUNT V

## FAILURE TO ADEQUATELY DISCLOSE

## AUTOMATIC ENROLLMENTS IN CONTINUITY PLANS

67.     Through the means described in Paragraphs 44-51, in connection with the advertising, marketing, promotion, offering for sale, or sale of AF Plus, Final Trim, and Neu Garcinia Cambogia, Defendant has represented, directly or indirectly, expressly or by implication, that consumers who provide their billing information will receive a free trial.

68.     In numerous instances in which Defendant made the representations set forth in Paragraph 67, Defendant failed to disclose, or disclose adequately, that consumers who agree to the free trial offer would be enrolled automatically in a continuity plan for future auto-shipments of AF Plus, Final Trim, or Neu Garcinia Cambogia that would be charged to their credit or debit cards.

69.     Defendant's failure to disclose, or disclose adequately, the material information described in Paragraph 68, in light of the representation set forth in Paragraph 67, constitutes a deceptive act or practice in or affecting commerce in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF MAINE LAW

70.     The Maine UTPA, § 207, declares unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

71.     Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 207 of the Maine UTPA.

72.     Section 206 of the Maine UTPA defines "trade" and "commerce" as including "the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this State."  5 M.R.S.A. § 206.

73.     Chapter 205-A, "Required Disclosures to Consumers," of Title 10 of Maine's statutes prohibits certain practices related to free trial offers.  10 M.R.S.A. §§ 1210 through 1210-B.

74.     Section 1210(2) prohibits making free offers unless, at the time of the offer, "the seller provides the consumer with clear and conspicuous information regarding the terms of the free offer, including any additional financial obligations that may be incurred as a result of accepting the free offer."  10 M.R.S.A. § 1210.

75.     Section 1210-A provides that a violation of Title 10, Chapter 205-A is a violation of the Maine UTPA.

22

**COUNT VI**

**FALSE OR UNSUBSTANTIATED CLAIMS FOR AF PLUS AND FINAL TRIM**

76.     Plaintiff State of Maine incorporates herein by reference all of the allegations contained in Paragraph 57 of this Complaint.

77.     The representations set forth in Paragraph 57 are false or misleading, or were not substantiated at the time the representations were made.  Therefore, the making of the representations described in Paragraph 57 constitutes a deceptive act or practice in the conduct of trade or commerce, in violation of 5 M.R.S.A. § 207.

78.     Defendant's conduct as described herein has been intentional.

**COUNT VII**

**FALSE CLAIMS THAT AF PLUS AND FINAL TRIM ARE PROVEN**

**TO CAUSE USERS TO LOSE SUBSTANTIAL WEIGHT**

79.     Plaintiff State of Maine incorporates herein by reference all of the allegations contained in Paragraphs 59 and 60 of this Complaint.

80.     The representations set forth in Paragraphs 59 and 60 are false or misleading. Therefore, the making of the representations set forth in Paragraphs 59 and 60, constitutes a deceptive act or practice in the conduct of trade or commerce, in violation of 5 M.R.S.A. § 207.

81.     Defendant's conduct, as described herein, has been intentional.

**COUNT VIII**

**FALSE ADVERTISING CLAIMS THROUGH CONSUMER TESTIMONIALS**

82.     Plaintiff State of Maine incorporates herein by reference all of the allegations contained in Paragraph 62 of this Complaint.

83.     The representations set forth in Paragraph 62 are false or misleading because the testimonialists appearing in Defendant's advertising were fictitious, and their reported experiences did not occur.  Therefore, the making of the representations set forth in Paragraph 62 constitutes a deceptive act or practice in the conduct of trade or commerce, in violation of 5 M.R.S.A. § 207.

84.     Defendant's conduct as described herein has been intentional.

**COUNT IX**

**DECEPTIVE FORMAT OF RADIO ADVERTISING**

85.     Plaintiff State of Maine incorporates herein by reference all of the allegations contained in Paragraph 64 of this Complaint.

86.     In truth and in fact, the radio advertisements referenced in Paragraph 64 were not objective news reports or public service announcements.  Therefore, the making of the representations set forth in Paragraph 64 constitutes a deceptive act or practice in the conduct of trade or commerce, in violation of 5 M.R.S.A. § 207.

87.     Defendant's conduct as described herein has been intentional.

**COUNT X**

**FAILURE TO ADEQUATELY DISCLOSE**

**AUTOMATIC ENROLLMENTS IN CONTINUITY PLANS**

88.     Plaintiff State of Maine incorporates herein by reference all of the allegations contained in Paragraphs 67 and 68 of this Complaint.

89.     Defendant's failure to disclose, or disclose adequately, the material information described in Paragraph 68, in light of the representation set forth in Paragraph 67, constitutes a

deceptive act or practice in the conduct of trade or commerce, in violation of 5 M.R.S.A. § 207 and 10 M.R.S.A. § 1210.

90.     Defendant's conduct as described herein has been intentional.

## CONSUMER INJURY

91.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendant's violations of the FTC Act and the Maine UTPA.  In addition, Defendant has been unjustly enriched as a result of its unlawful acts or practices.  Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THE COURT'S POWER TO GRANT RELIEF

92.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

93.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction to enable Plaintiff State of Maine to enforce its state law claims under the Maine Unfair Trade Practices Act, 5 M.R.S.A. §§ 205-a through 214, against Defendant in this Court.  Section 209 of the Maine UTPA empowers this Court to grant injunctive and such other relief, including civil penalties for intentional violations, as the Court may deem appropriate to halt and redress violations of any provision of the Maine UTPA enforced by the Maine Attorney General.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including

rescission or reformation of contracts, restitution, the refund of monies paid, and the

disgorgement of ill-gotten monies, to prevent and remedy any violation of the Maine UTPA

enforced by the Maine Attorney General.

## FTC PRAYER FOR RELIEF

Wherefore, Plaintiff Federal Trade Commission, pursuant to Section 13(b) of the FTC

Act, 15 U.S.C. § 53(b), and the Court's own equitable powers, requests that the Court:

A.      Enter a permanent injunction to prevent future violations of the FTC Act by

Defendant;

B.      Award such relief as the Court finds necessary to redress injury to consumers

resulting from Defendant's violations of the FTC Act, including but not limited

to, rescission or reformation of contracts, restitution, the refund of monies paid,

and the disgorgement of ill-gotten monies; and

C.      Award Plaintiff FTC the costs of bringing this action, as well as such other and

additional relief as the Court may determine to be just and proper.

## MAINE PRAYER FOR RELIEF

Wherefore, Plaintiff State of Maine, pursuant to the Maine UTPA, 5 M.R.S.A. § 209, and

the Court's own equitable powers, requests that the Court:

A.      Enter an order declaring Defendant's above-described conduct to be in violation

of the Maine UTPA, 5 M.R.S.A. § 207, and to be intentional violations pursuant

to the Maine UTPA, 5 M.R.S.A. § 209;

B.      Enter a permanent injunction to prevent future violations of the Maine UTPA by

Defendant;

C.      Award such relief as the Court finds necessary to redress injury to consumers

resulting from Defendant's violations of the Maine UTPA, including but not

limited to, rescission or reformation of contracts, restitution, the refund of monies

paid, and the disgorgement of ill-gotten monies;

D.      Adjudge civil penalties of not more than ten thousand dollars ($10,000) for each

intentional violation of the Maine UTPA pursuant to 5 M.R.S.A. § 209; and

E.      Award Plaintiff State of Maine the costs of bringing this action, prejudgment

interest pursuant to 14 M.R.S.A. § 1602-B, and such other and additional relief as

the Court may determine to be just and proper.


Respectfully submitted,


DAVID C. SHONKA                     JANET T. MILLS
Acting General Counsel              Attorney General, State of Maine


/s/ James A. Prunty                 /s/ Brendan F.X. O'Neil
James A. Prunty                     Brendan F.X. O'Neil
Federal Trade Commission            Linda J. Conti
600 Pennsylvania Avenue, NW         Assistant Attorney General
Washington, D.C. 20580              6 State House Station
Telephone: 202-326-2438             Augusta, Maine 04333-0006
Facsimile:  202-326-3259            Telephone: 207-626-8842,8812
Email: jprunty@ftc.gov              Facsimile:  207-624-7730
                                    Email: brendan.oneil@maine.gov
                                            linda.conti@maine.gov


Attorneys for Plaintiff             Attorneys for Plaintiff
FEDERAL TRADE COMMISSION            STATE OF MAINE